CORRECTIONAL SERVICES CORP. *v.* MALESKO

No. 00–860.   Argued October 1, 2001—Decided November 27, 2001

62

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CON-
NOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. SCALIA, J., filed a con-
curring opinion, in which THOMAS, J., joined, *post*, p. 75. STEVENS, J.,

filed a dissenting opinion, in which SOUTER, GINSBURG, and BREYER, JJ., joined, *post*, p. 75.

*Carter G. Phillips* argued the cause for petitioner. With him on the briefs were *Frank R. Volpe, George P. Stasiuk,* and *Karen M. Morinelli.*

*Jeffrey A. Lamken* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Solicitor General Underwood, Deputy Solicitor General Clement, Barbara L. Herwig,* and *Thomas M. Bondy.*

*Steven Pasternak* argued the cause for respondent. With him on the brief was *David C. Vladeck.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

We decide here whether the implied damages action first recognized in *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971), should. be extended to allow recovery against a private corporation operating a halfway house under contract with the Bureau of Prisons. We decline to so extend *Bivens.*

Petitioner Correctional Services Corporation (CSC), under contract with the federal Bureau of Prisons (BOP), operates Community Corrections Centers and other facilities that house federal prisoners and detainees.[1] Since the late

---

*Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union by *Elizabeth Alexander, Margaret Winter, David Fathi,* and *Steven R. Shapiro;* and for the Legal Aid Society of the City of New York by *Daniel L. Greenberg* and *John Boston.*

[1] CSC is hardly unique in this regard. The BOP has since 1981 relied exclusively on contracts with private institutions and state and local governments for the operation of halfway house facilities to help federal prisoners reintegrate into society. The BOP contracts not only with for-profit entities like CSC, but also with charitable organizations like Volunteers for America (which operates facilities in Indiana, Louisiana, Maryland, Minnesota, New York, and Texas), the Salvation Army (Arkansas, Florida, Illinois, North Carolina, Tennessee, and Texas), Progress

1980's, CSC has operated Le Marquis Community Correctional Center (Le Marquis), a halfway house located in New York City. Respondent John E. Malesko is a former federal inmate who, having been convicted of federal securities fraud in December 1992, was sentenced to a term of 18 months' imprisonment under the supervision of the BOP. During his imprisonment, respondent was diagnosed with a heart condition and treated with prescription medication. Respondent's condition limited his ability to engage in physical activity, such as climbing stairs.

In February 1993, the BOP transferred respondent to Le Marquis where he was to serve the remainder of his sentence. Respondent was assigned to living quarters on the fifth floor. On or about March 1, 1994, CSC instituted a policy at Le Marquis requiring inmates residing below the sixth floor to use the staircase rather than the elevator to travel from the first-floor lobby to their rooms. There is no dispute that respondent was exempted from this policy on account of his heart condition. Respondent alleges that on March 28, 1994, however, Jorge Urena, an employee of CSC, forbade him to use the elevator to reach his fifth-floor bedroom. Respondent protested that he was specially permitted elevator access, but Urena was adamant. Respondent then climbed the stairs, suffered a heart attack, and fell, injuring his left ear.

Three years after this incident occurred, respondent filed a *pro se* action against CSC and unnamed CSC employees in the United States District Court for the Southern District of New York. Two years later, now acting with counsel, respondent filed an amended complaint which named Urena as 1 of the 10 John Doe defendants. The amended complaint alleged that CSC, Urena, and unnamed defendants were "negligent in failing to obtain requisite medication for [respondent's] condition and were further negligent by refusing

House Association (Oregon), Triangle Center (Illinois), and Catholic Social Services (Pennsylvania).

[respondent] the use of the elevator." App. 12. It further alleged that respondent injured his left ear and aggravated a pre-existing condition "[a]s a result of the negligence of the Defendants." *Ibid.* Respondent demanded judgment in the sum of $1 million in compensatory damages, $3 million in anticipated future damages, and punitive damages "for such sum as the Court and/or [j]ury may determine." *Id.,* at 13.

The District Court treated the amended complaint as raising claims under *Bivens* v. *Six Unknown Fed. Narcotics Agents, supra,* and dismissed respondent's cause of action in its entirety. App. to Pet. for Cert. 20a. Relying on our decision in *FDIC* v. *Meyer,* 510 U. S. 471 (1994), the District Court reasoned that "a *Bivens* action may only be maintained against an individual," and thus was not available against CSC, a corporate entity. App. to Pet. for Cert. 20a. With respect to Urena and the unnamed individual defendants, the complaint was dismissed on statute of limitations grounds.

The Court of Appeals for the Second Circuit affirmed in part, reversed in part, and remanded. 229 F. 3d 374 (2000). That court affirmed dismissal of respondent's claims against individual defendants as barred by the statute of limitations. Respondent has not challenged that ruling, and the parties agree that the question whether a *Bivens* action might lie against a private individual is not presented here. With respect to CSC, the Court of Appeals remarked that *Meyer* expressly declined "'to expand the category of defendants against whom *Bivens*-type actions may be brought to include not only federal agents, but federal agencies as well.'" 229 F. 3d, at 378 (quoting *Meyer, supra,* at 484 (emphasis deleted)). But the court reasoned that private entities like CSC should be held liable under *Bivens* to "accomplish the . . . important *Bivens* goal of providing a remedy for constitutional violations." 229 F. 3d, at 380.

We granted certiorari, 532 U. S. 902 (2001), and now reverse.[2]

In *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971), we recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights. Respondent now asks that we extend this limited holding to confer a right of action for damages against private entities acting under color of federal law. He contends that the Court must recognize a federal remedy at law wherever there has been an alleged constitutional deprivation, no matter that the victim of the alleged deprivation might have alternative remedies elsewhere, and that the proposed remedy would not significantly deter the principal wrongdoer, an individual private employee. We have heretofore refused to imply new substantive liabilities under such circumstances, and we decline to do so here.

Our authority to imply a new constitutional tort, not expressly authorized by statute, is anchored in our general jurisdiction to decide all cases "arising under the Constitution, laws, or treaties of the United States." 28 U. S. C. § 1331. See, *e. g., Schweiker* v. *Chilicky,* 487 U. S. 412, 420–421 (1988); *Bush* v. *Lucas,* 462 U. S. 367, 373–374 (1983). We first exercised this authority in *Bivens,* where we held that a victim of a Fourth Amendment violation by federal officers may bring suit for money damages against the officers in federal court. *Bivens* acknowledged that Congress had never provided for a private right of action against federal

---

[2] The Courts of Appeals have divided on whether *FDIC* v. *Meyer,* 510 U. S. 471 (1994), forecloses the extension of *Bivens* to private entities. Compare *Hammons* v. *Norfolk Southern Corp.,* 156 F. 3d 701, 705 (CA6 1998) ("Nothing in *Meyer* prohibits a *Bivens* claim against a private corporation that engages in federal action"), with *Kauffman* v. *Anglo-American School of Sofia,* 28 F. 3d 1223, 1227 (CADC 1994) ("[Under] *Meyer's* conclusion that public federal agencies are not subject to *Bivens* liability, it follows that equivalent private entities should not be liable either"). We hold today that it does.

officers, and that "the Fourth Amendment does not in so many words provide for its enforcement by award of money damages for the consequences of its violation." 403 U. S., at 396. Nonetheless, relying largely on earlier decisions implying private damages actions into federal statutes, see *id.*, at 397 (citing *J. I. Case Co.* v. *Borak,* 377 U. S. 426, 433 (1964)); 403 U. S., at 402–403, n. 4 (Harlan, J., concurring in judgment) ("The *Borak* case is an especially clear example of the exercise of federal judicial power to accord damages as an appropriate remedy in the absence of any express statutory authorization of a federal cause of action"), and finding "no special factors counseling hesitation in the absence of affirmative action by Congress," *id.*, at 395–396, we found an implied damages remedy available under the Fourth Amendment.[3]

In the decade following *Bivens,* we recognized an implied damages remedy under the Due Process Clause of the Fifth Amendment, *Davis* v. *Passman,* 442 U. S. 228 (1979), and the Cruel and Unusual Punishments Clause of the Eighth Amendment, *Carlson* v. *Green,* 446 U. S. 14 (1980). In both *Davis* and *Carlson,* we applied the core holding of *Bivens,* recognizing in limited circumstances a claim for money damages against federal officers who abuse their constitutional authority. In *Davis,* we inferred a new right of action chiefly because the plaintiff lacked any other remedy for the alleged constitutional deprivation. 442 U. S., at 245. ("For Davis, as for Bivens, it is damages or nothing"). In *Carlson,* we in-

---

[3] Since our decision in *Borak,* we have retreated from our previous willingness to imply a cause of action where Congress has not provided one. See, *e. g., Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.,* 511 U. S. 164, 188 (1994); *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11, 15–16 (1979); *Cannon* v. *University of Chicago,* 441 U. S. 677, 688 (1979); *id.*, at 717–718 (REHNQUIST, J., concurring). Just last Term it was noted that we "abandoned" the view of *Borak* decades ago, and have repeatedly declined to "revert" to "the understanding of private causes of action that held sway 40 years ago." *Alexander* v. *Sandoval,* 532 U. S. 275, 287 (2001).

ferred a right of action against individual prison officials where the plaintiff's only alternative was a Federal Tort Claims Act (FTCA) claim against the United States. 446 U. S., at 18–23. We reasoned that the threat of suit against the United States was insufficient to deter the unconstitutional acts of individuals. *Id.*, at 21 ("Because the *Bivens* remedy is recoverable against individuals, it is a more effective deterrent than the FTCA remedy"). We also found it "crystal clear" that Congress intended the FTCA and *Bivens* to serve as "parallel" and "complementary" sources of liability. 446 U. S., at 19–20.

Since *Carlson* we have consistently refused to extend *Bivens* liability to any new context or new category of defendants. In *Bush* v. *Lucas, supra,* we declined to create a *Bivens* remedy against individual Government officials for a First Amendment violation arising in the context of federal employment. Although the plaintiff had no opportunity to fully remedy the constitutional violation, we held that administrative review mechanisms crafted by Congress provided meaningful redress and thereby foreclosed the need to fashion a new, judicially crafted cause of action. 462 U. S., at 378, n. 14, 386–388. We further recognized Congress' institutional competence in crafting appropriate relief for aggrieved federal employees as a "special factor counseling hesitation in the creation of a new remedy." *Id.*, at 380. See also *id.*, at 389 (noting that "Congress is in a far better position than a court to evaluate the impact of a new species of litigation between federal employees"). We have reached a similar result in the military context, *Chappell* v. *Wallace,* 462 U. S. 296, 304 (1983), even where the defendants were alleged to have been civilian personnel, *United States* v. *Stanley,* 483 U. S. 669, 681 (1987).

In *Schweiker* v. *Chilicky,* we declined to infer a damages action against individual Government employees alleged to have violated due process in their handling of Social Security applications. We observed that our "decisions have re-

sponded cautiously to suggestions that *Bivens* remedies be extended into new contexts." 487 U. S., at 421. In light of these decisions, we noted that "[t]he absence of statutory relief for a constitutional violation . . . does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation." *Id.*, at 421–422. We therefore rejected the claim that a *Bivens* remedy should be implied simply for want of any other means for challenging a constitutional deprivation in federal court. It did not matter, for example, that "[t]he creation of a *Bivens* remedy would obviously offer the prospect of relief for injuries that must now go unredressed." 487 U. S., at 425. See also *Bush, supra,* at 388 (noting that "existing remedies do not provide complete relief for the plaintiff"); *Stanley, supra,* at 683 ("[I]t is irrelevant to a special factors analysis whether the laws currently on the books afford Stanley . . . an adequate federal remedy for his injuries" (internal quotation marks omitted)). So long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability. *Chilicky, supra,* at 425–427.

Most recently, in *FDIC* v. *Meyer,* we unanimously declined an invitation to extend *Bivens* to permit suit against a federal agency, even though the agency—because Congress had waived sovereign immunity—was otherwise amenable to suit. 510 U. S., at 484–486. Our opinion emphasized that "the purpose of *Bivens* is to deter *the officer,*" not the agency. *Id.,* at 485 (emphasis in original) (citing *Carlson* v. *Green, supra,* at 21). We reasoned that if given the choice, plaintiffs would sue a federal agency instead of an individual who could assert qualified immunity as an affirmative defense. To the extent aggrieved parties had less incentive to bring a damages claim against individuals, "the deterrent effects of the *Bivens* remedy would be lost." 510 U. S., at 485. Accordingly, to allow a *Bivens* claim against federal agencies "would mean the evisceration of the *Bivens* remedy,

rather than its extension." 510 U. S., at 485. We noted further that "special factors" counseled hesitation in light of the "potentially enormous financial burden" that agency liability would entail. *Id.*, at 486.

From this discussion, it is clear that the claim urged by respondent is fundamentally different from anything recognized in *Bivens* or subsequent cases. In 30 years of *Bivens* jurisprudence we have extended its holding only twice, to provide an otherwise nonexistent cause of action against *individual officers* alleged to have acted unconstitutionally, or to provide a cause of action for a plaintiff who lacked *any alternative remedy* for harms caused by an individual officer's unconstitutional conduct. Where such circumstances are not present, we have consistently rejected invitations to extend *Bivens*, often for reasons that foreclose its extension here.[4]

The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations. *Meyer* made clear that the threat of litigation and liability will adequately deter federal officers for *Bivens* purposes no matter that they may enjoy qualified immunity, 510 U. S., at 474, 485, are indemnified by the employing agency or entity, *id.*, at 486, or are acting pursuant to an entity's policy, *id.*, at 473–474. *Meyer* also made clear that the threat of suit against an individual's employer was not the kind of deterrence contemplated by *Bivens*. See 510 U. S., at 485 ("If we were to imply a damages action directly against federal agencies . . . there would be no reason for aggrieved parties to bring damages actions against individual officers. [T]he deterrent

---

[4] JUSTICE STEVENS' claim that this case does not implicate an "extension" of *Bivens*, *post*, at 76–77, 82 (dissenting opinion), might come as some surprise to the Court of Appeals which twice characterized its own holding as "extending *Bivens* liability to reach private corporations." 229 F. 3d 374, 381 (CA2 2000). See also *ibid.* ("*Bivens* liability should extend to private corporations").

effects of the *Bivens* remedy would be lost"). This case is, in every meaningful sense, the same. For if a corporate defendant is available for suit, claimants will focus their collection efforts on it, and not the individual directly responsible for the alleged injury. See, *e. g., TXO Production Corp.* v. *Alliance Resources Corp.*, 509 U. S. 443, 464 (1993) (plurality opinion) (recognizing that corporations fare much worse before juries than do individuals); *id.*, at 490–492 (O'CONNOR, J., dissenting) (same) (citing authorities). On the logic of *Meyer*, inferring a constitutional tort remedy against a private entity like CSC is therefore foreclosed.

Respondent claims that even under *Meyer's* deterrence rationale, implying a suit against private corporations acting under color of federal law is still necessary to advance the core deterrence purpose of *Bivens*. He argues that because corporations respond to market pressures and make decisions without regard to constitutional obligations, requiring payment for the constitutional harms they commit is the best way to discourage future harms. That may be so, but it has no relevance to *Bivens*, which is concerned solely with deterring the unconstitutional acts of individual officers. If deterring the conduct of a policymaking entity was the purpose of *Bivens*, then *Meyer* would have implied a damages remedy against the Federal Deposit Insurance Corporation; it was after all an agency policy that led to *Meyer's* constitutional deprivation. *Meyer, supra,* at 473–474. But *Bivens* from its inception has been based not on that premise, but on the deterrence of individual officers who commit unconstitutional acts.

There is no reason for us to consider extending *Bivens* beyond this core premise here.[5] To begin with, *no federal*

---

[5] JUSTICE STEVENS claims that our holding in favor of CSC portends "tragic consequence[s]," *post,* at 81, and "jeopardize[s] the constitutional rights of . . . tens of thousands of inmates," *ibid.* He refers to examples

*prisoners* enjoy respondent's contemplated remedy. If a federal prisoner in a BOP facility alleges a constitutional deprivation, he may bring a *Bivens* claim against the offending individual officer, subject to the defense of qualified immunity. The prisoner may not bring a *Bivens* claim against the officer's employer, the United States, or the BOP. With respect to the alleged constitutional deprivation, his only remedy lies against the individual; a remedy *Meyer* found sufficient, and which respondent did not timely pursue. Whether it makes sense to impose asymmetrical liability costs on private prison facilities alone is a question for Congress, not us, to decide.

Nor are we confronted with a situation in which claimants in respondent's shoes lack effective remedies. Cf. *Bivens*, 403 U. S., at 410 (Harlan, J., concurring in judgment) ("For people in Bivens' shoes, it is damages or nothing"); *Davis*, 442 U. S., at 245 ("For Davis, as for Bivens, it is damages or nothing" (internal quotaton marks omitted)). It was conceded at oral argument that alternative remedies are at least as great, and in many respects greater, than anything that could be had under *Bivens.* Tr. of Oral Arg. 41–42, 43. For example, federal prisoners in private facilities enjoy a par-

---

of cases suggesting that private correctional providers routinely abuse and take advantage of inmates under their control. *Post*, at 81, n. 9 (citing Brief for Legal Aid Society of City of New York as *Amicus Curiae* 8–25). See also Brief for American Civil Liberties Union as *Amicus Curiae* 14–16, and n. 6 (citing and discussing "abundant" examples of such abuse). In all but one of these examples, however, the private facility in question housed *state* prisoners—prisoners who already enjoy a right of action against private correctional providers under 42 U. S. C. § 1983. If it is true that the imperatives for deterring the unconstitutional conduct of private correctional providers are so strong as to demand that we imply a new right of action directly from the Constitution, then abuses of authority should be *less* prevalent in state facilities, where Congress already provides for such liability. That the trend appears to be just the opposite is not surprising given the BOP's oversight and monitoring of its private contract facilities, see Brief for United States as *Amicus Curiae* 4–5, 24–26, which JUSTICE STEVENS does not mention.

allel tort remedy that is unavailable to prisoners housed in Government facilities. See Brief in Opposition 13. This case demonstrates as much, since respondent's complaint in the District Court arguably alleged no more than a quintessential claim of negligence. It maintained that named and unnamed defendants were "*negligent* in failing to obtain requisite medication . . . and were further *negligent* by refusing . . . use of the elevator." App. 12 (emphasis added). It further maintained that respondent suffered injuries "[a]s a result of the *negligence* of the Defendants." *Ibid.* (emphasis added). The District Court, however, construed the complaint as raising a *Bivens* claim, presumably under the Cruel and Unusual Punishments Clause of the Eighth Amendment. Respondent accepted this theory of liability, and he has never sought relief on any other ground. This is somewhat ironic, because the heightened "deliberate indifference" standard of Eighth Amendment liability, *Estelle* v. *Gamble,* 429 U. S. 97, 104 (1976), would make it considerably more difficult for respondent to prevail than on a theory of ordinary negligence, see, *e. g., Farmer* v. *Brennan,* 511 U. S. 825, 835 (1994) ("[D]eliberate indifference describes a state of mind more blameworthy than negligence").

This also makes respondent's situation altogether different from *Bivens,* in which we found alternative state tort remedies to be "inconsistent or even hostile" to a remedy inferred from the Fourth Amendment. 403 U. S., at 393–394. When a federal officer appears at the door and requests entry, one cannot always be expected to resist. See *id.,* at 394 ("[A] claim of authority to enter is likely to unlock the door"). Yet lack of resistance alone might foreclose a cause of action in trespass or privacy. *Ibid.* Therefore, we reasoned in *Bivens* that other than an implied constitutional tort remedy, "there remain[ed] . . . but the alternative of resistance, which may amount to a crime." *Id.,* at 395 (internal quotation marks and citation omitted). Such logic does not apply to

respondent, whose claim of negligence or deliberate indifference requires no resistance to official action, and whose lack of alternative tort remedies was due solely to strategic choice.[6]

Inmates in respondent's position also have full access to remedial mechanisms established by the BOP, including suits in federal court for injunctive relief and grievances filed through the BOP's Administrative Remedy Program (ARP). See 28 CFR § 542.10 (2001) (explaining ARP as providing "a process through which inmates may seek formal review of an issue which relates to any aspect of their confinement"). This program provides yet another means through which allegedly unconstitutional actions and policies can be brought to the attention of the BOP and prevented from recurring. And unlike the *Bivens* remedy, which we have never considered a proper vehicle for altering an entity's policy, injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally.

In sum, respondent is not a plaintiff in search of a remedy as in *Bivens* and *Davis.* Nor does he seek a cause of action against an individual officer, otherwise lacking, as in *Carlson.* Respondent instead seeks a marked extension of *Bivens,* to contexts that would not advance *Bivens'* core purpose of deterring individual officers from engaging in unconstitutional wrongdoing. The caution toward extending *Bivens* remedies into any new context, a caution consistently and repeatedly recognized for three decades, forecloses such an extension here.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

---

[6] Where the government has directed a contractor to do the very thing that is the subject of the claim, we have recognized this as a special circumstance where the contractor may assert a defense. *Boyle* v. *United Technologies Corp.,* 487 U. S. 500 (1988). The record here would provide no basis for such a defense.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring.

I join the opinion of the Court because I agree that a narrow interpretation of the rationale of *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), would not logically produce its application to the circumstances of this case. The dissent is doubtless correct that a broad interpretation of its rationale *would* logically produce such application, but I am not inclined (and the Court has not been inclined) to construe *Bivens* broadly.

In joining the Court's opinion, however, I do not mean to imply that, *if* the narrowest rationale of *Bivens did* apply to a new context, I *would* extend its holding. I would not. *Bivens* is a relic of the heady days in which this Court assumed common-law powers to create causes of action—decreeing them to be "implied" by the mere existence of a statutory or constitutional prohibition. As the Court points out, *ante*, at 67, n. 3, we have abandoned that power to invent "implications" in the statutory field, see *Alexander* v. *Sandoval*, 532 U. S. 275, 287 (2001). There is even greater reason to abandon it in the constitutional field, since an "implication" imagined in the Constitution can presumably not even be repudiated by Congress. I would limit *Bivens* and its two follow-on cases (*Davis* v. *Passman*, 442 U. S. 228 (1979), and *Carlson* v. *Green*, 446 U. S. 14 (1980)) to the precise circumstances that they involved.

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

In *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), the Court affirmatively answered the question that it had reserved in *Bell* v. *Hood*, 327 U. S. 678 (1946): whether a violation of the Fourth Amendment "by *a federal agent* acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct." 403 U. S., at 389 (emphasis added). Nearly a

decade later, in *Carlson* v. *Green*, 446 U. S. 14 (1980), we held that a violation of the Eighth Amendment by federal prison officials gave rise to a *Bivens* remedy despite the fact that the plaintiffs also had a remedy against the United States under the Federal Tort Claims Act (FTCA). We stated: "*Bivens* established that the victims of a constitutional violation by *a federal agent* have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right." 446 U. S., at 18 (emphasis added).

In subsequent cases, we have decided that a *Bivens* remedy is not available for every conceivable constitutional violation.[1] We have never, however, qualified our holding that Eighth Amendment violations are actionable under *Bivens*. See *Farmer* v. *Brennan*, 511 U. S. 825 (1994); *McCarthy* v. *Madigan*, 503 U. S. 140 (1992). Nor have we ever suggested that a category of federal agents can commit Eighth Amendment violations with impunity.

The parties before us have assumed that respondent's complaint has alleged a violation of the Eighth Amendment.[2] The violation was committed by a federal agent—a private corporation employed by the Bureau of Prisons to perform functions that would otherwise be performed by individual employees of the Federal Government. Thus, the question presented by this case is whether the Court should create an exception to the straightforward application of *Bivens* and

---

[1] See, *e. g., FDIC* v. *Meyer*, 510 U. S. 471 (1994); *Schweiker* v. *Chilicky*, 487 U. S. 412 (1988); *Bush* v. *Lucas*, 462 U. S. 367 (1983); *Chappell* v. *Wallace*, 462 U. S. 296 (1983).

[2] Although it might have challenged the sufficiency of respondent's constitutional claim, see *ante*, at 72–73, petitioner has not done so. See Tr. of Oral Arg. 55 (acknowledgment by petitioner that the complaint states an Eighth Amendment violation). Its petition for certiorari presented the single question whether a *Bivens* cause of action for damages "should be implied against a private corporation acting under color of federal law." Pet. for Cert. (i).

*Carlson*, not whether it should extend our cases beyond their "core premise," *ante*, at 71. This point is evident from the fact that prior to our recent decision in *FDIC* v. *Meyer*, 510 U. S. 471 (1994), the Courts of Appeals had consistently and correctly held that corporate agents performing federal functions, like human agents doing so, were proper defendants in *Bivens* actions.[3]

*Meyer*, which concluded that federal agencies are not suable under *Bivens*, does not lead to the outcome reached by the Court today. In that case, we did not discuss private corporate agents, nor suggest that such agents should be viewed differently from human ones. Rather, in *Meyer*, we drew a distinction between "federal agents" and "an agency of the Federal Government," 510 U. S., at 473. Indeed, our repeated references to the Federal Deposit Insurance Corporation's (FDIC) status as a "federal agency" emphasized the FDIC's affinity to the federal sovereign. We expressed concern that damages sought directly from federal agencies, such as the FDIC, would "creat[e] a potentially enormous financial burden for the Federal Government." *Id.*, at 486. And it must be kept in mind that *Meyer* involved the FDIC's waiver of sovereign immunity, which, had the Court in *Meyer* recognized a cause of action, would have permitted the very sort of lawsuit that *Bivens* presumed impossi-

---

[3] See *Schowengerdt* v. *General Dynamics Corp.*, 823 F. 2d 1328 (CA9 1987); *Reuber* v. *United States*, 750 F. 2d 1039 (CADC 1984); *Gerena* v. *Puerto Rico Legal Servs., Inc.*, 697 F. 2d 447 (CA1 1983); *Dobyns* v. *E-Systems, Inc.*, 667 F. 2d 1219 (CA5 1982); *Yiamouyiannis* v. *Chemical Abstracts Serv.*, 521 F. 2d 1392 (CA6 1975).

It is true that one court has overruled its Circuit precedent in light of *Meyer* and held that *Meyer* dictates the exclusion of all corporate entities from *Bivens* liability. *Kauffman* v. *Anglo-American School of Sofia*, 28 F. 3d 1223 (CADC 1994). However, as another court has explained, that conclusion is in no way compelled by *Meyer*. See *Hammons* v. *Norfolk Southern Corp.*, 156 F. 3d 701 (CA6 1998).

ble: "a direct action against the Government." 510 U. S., at 485.[4]

Moreover, in *Meyer*, as in *Bush* v. *Lucas*, 462 U. S. 367 (1983), and *Schweiker* v. *Chilicky*, 487 U. S. 412 (1988), we were not dealing with a well-recognized cause of action. The cause of action alleged in *Meyer* was a violation of procedural due process, and as the *Meyer* Court noted, "a *Bivens* action alleging a violation of the Due Process Clause of the Fifth Amendment may be appropriate in some contexts, but not in others." 510 U. S., at 484, n. 9. Not only is substantive liability assumed in the present case, but respondent's Eighth Amendment claim falls in the heartland of substantive *Bivens* claims.[5]

Because *Meyer* does not dispose of this case, the Court claims that the rationales underlying *Bivens*—namely, lack of alternative remedies and deterrence—are not present in cases in which suit is brought against a private corporation serving as a federal agent. However, common sense, buttressed by all of the reasons that supported the holding in *Bivens*, leads to the conclusion that corporate agents should not be treated more favorably than human agents.

First, the Court argues that respondent enjoys alternative remedies against the corporate agent that distinguish this case from *Bivens*. In doing so, the Court characterizes *Bivens* and its progeny as cases in which plaintiffs lacked *"any alternative remedy," ante*, at 70. In *Bivens*, however, even though the plaintiff's suit against the Federal Gov-

---

[4] *Meyer* also did not address the present situation because the Court understood the plaintiff's "real complaint" in that case to be that the individual officers would be shielded by qualified immunity, 510 U. S., at 485, a concern not present in the case before us, see *Richardson* v. *McKnight*, 521 U. S. 399, 412 (1997) (denying qualified immunity to private prison guards in a suit under 42 U. S. C. § 1983).

[5] The Court incorrectly assumes that we are being asked "to imply a new constitutional tort," *ante*, at 66. The tort here is, however, well established; the only question is whether a remedy in damages is available against a limited class of tortfeasors.

ernment under state tort law may have been barred by sovereign immunity, a suit against the officer himself under state tort law was theoretically possible. Moreover, as the Court recognized in *Carlson*, *Bivens* plaintiffs also have remedies available under the FTCA. Thus, the Court is incorrect to portray *Bivens* plaintiffs as lacking any other avenue of relief, and to imply as a result that respondent in this case had a substantially wider array of non-*Bivens* remedies at his disposal than do other *Bivens* plaintiffs.[6] If alternative remedies provide a sufficient justification for closing the federal forum here, where the defendant is a private corporation, the claims against the individual defendants in *Carlson*, in light of the FTCA alternative, should have been rejected as well.[7]

It is ironic that the Court relies so heavily for its holding on this assumption that alternative effective remedies— primarily negligence actions in state court—are available to respondent. See *ante*, at 72–74. Like Justice Harlan, I think it "entirely proper that these injuries be compensable according to uniform rules of federal law, especially in

---

[6] The Court recognizes that the question whether a *Bivens* action would lie against the individual employees of a private corporation like Correctional Services Corporation (CSC) is not raised in the present case. *Ante*, at 65. Both CSC and respondent have assumed *Bivens* would apply to these individuals, and the United States as *amicus* maintains that such liability would be appropriate under *Bivens*. It does seem puzzling that *Bivens* liability would attach to the private individual employees of such corporations—*subagents* of the Federal Government—but not to the corporate agents themselves. However, the United States explicitly maintains this to be the case, and the reasoning of the Court's opinion relies, at least in part, on the availability of a remedy against employees of private prisons. Cf. *ante*, at 72 (noting that *Meyer* "found sufficient" a remedy against the individual officer, "*which respondent did not timely pursue*" (emphasis added)).

[7] Although the Court lightly references administrative remedies that might be available to CSC-housed inmates, these are by no means the sort of comprehensive administrative remedies previously contemplated by the Court in *Bush* and *Schweiker*.

light of the very large element of federal law which must in any event control the scope of official defenses to liability." *Bivens*, 403 U. S., at 409 (opinion concurring in judgment). And aside from undermining uniformity, the Court's reliance on state tort law will jeopardize the protection of the full scope of federal constitutional rights.   State law might have comparable causes of action for tort claims like the Eighth Amendment violation alleged here, see *ante*, at 73, but other unconstitutional actions by prison employees, such as violations of the Equal Protection or Due Process Clauses, may find no parallel causes of action in state tort law.   Even though respondent here may have been able to sue for some degree of relief under state law because his Eighth Amendment claim could have been pleaded as negligence, future plaintiffs with constitutional claims less like traditional torts will not necessarily be so situated.[8]

Second, the Court claims that the deterrence goals of *Bivens* would not be served by permitting liability here. *Ante*, at 71 (citing *Meyer*).   It cannot be seriously maintained, however, that tort remedies against corporate employers have less deterrent value than actions against their

---

[8] The Court blames respondent, who filed his initial complaint *pro se*, for the lack of state remedies in this case; according to the Court, respondent's failure to bring a negligence suit in state court was "due solely to strategic choice," *ante*, at 74.  Such strategic behavior, generally speaking, is imaginable, but there is no basis in the case before us to charge respondent with acting strategically.   Cf. *ante*, at 73 (discussing how proving a federal constitutional claim would be "considerably more difficult" than proving a state negligence claim).   Respondent filed his complaint in federal court because he believed himself to have been severely maltreated while in federal custody, and he had no legal counsel to advise him to do otherwise. Without the aid of counsel, respondent not only failed to file for state relief, but he also failed to name the particular prison guard who was responsible for his injuries, resulting in the eventual dismissal of the claims against the individual officers as time barred.   Respondent may have been an unsophisticated plaintiff, or, at worst, not entirely diligent about determining the identify of the guards, but it can hardly be said that "strategic choice" was the driving force behind respondent's litigation behavior.

employees. As the Court has previously noted, the "orga-
nizational structure" of private prisons "is one subject to
the ordinary competitive pressures that normally help pri-
vate firms adjust their behavior in response to the incentives
that tort suits provide—pressures not necessarily present in
government departments." *Richardson* v. *McKnight*, 521
U. S. 399, 412 (1997). Thus, the private corporate entity at
issue here is readily distinguishable from the federal agency
in *Meyer*. Indeed, a tragic consequence of today's decision
is the clear incentive it gives to corporate managers of pri-
vately operated custodial institutions to adopt cost-saving
policies that jeopardize the constitutional rights of the tens
of thousands of inmates in their custody.[9]

The Court raises a concern with imposing "asymmetri-
cal liability costs on private prison facilities," *ante*, at 72,
and further claims that because federal prisoners in
Government-run institutions can only sue officers, it would
be unfair to permit federal prisoners in private institu-
tions to sue an "officer's employer," *ibid.* Permitting liabil-
ity in the present case, however, would *produce* symmetry:
both private and public prisoners would be unable to sue
the principal (*i. e.*, the Government), but would be able to
sue the primary federal agent (*i. e.*, the Government official
or the corporation). Indeed, it is the *Court's* decision that
creates asymmetry—between federal and state prisoners
housed in private correctional facilities. Under 42 U. S. C.
§ 1983, a state prisoner may sue a private prison for depri-
vation of constitutional rights, see *Lugar* v. *Edmondson Oil
Co.*, 457 U. S. 922, 936–937 (1982) (permitting suit under

---

[9] As *amici* for respondent explain, private prisons are exempt from
much of the oversight and public accountability faced by the Bureau of
Prisons, a federal entity. See, *e. g.*, Brief for Legal Aid Society of the City
of New York as *Amicus Curiae* 8–25. Indeed, because a private prison
corporation's first loyalty is to its stockholders, rather than the public in-
terest, it is no surprise that cost-cutting measures jeopardizing prisoners'
rights are more likely in private facilities than in public ones.

§ 1983 against private corporations exercising "state action"), yet the Court denies such a remedy to that prisoner's federal counterpart. It is true that we have never expressly held that the contours of *Bivens* and § 1983 are identical. The Court, however, has recognized sound jurisprudential reasons for parallelism, as different standards for claims against state and federal actors "would be incongruous and confusing." *Butz* v. *Economou*, 438 U. S. 478, 499 (1978) (internal quotation marks omitted); cf. *Bolling* v. *Sharpe*, 347 U. S. 497, 500 (1954) ("In view of our decision that the Constitution prohibits the states from maintaining racially segregated public schools, it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government"). The value of such parallelism was in fact furthered by *Meyer,* since § 1983 would not have provided the plaintiff a remedy had he pressed a similar claim against a state agency.

It is apparent from the Court's critical discussion of the thoughtful opinions of Justice Harlan and his contemporaries, *ante,* at 66–67, and n. 3, and from its erroneous statement of the question presented by this case as whether *Bivens* "should be extended" to allow recovery against a private corporation employed as a federal agent, *ante,* at 63, that the driving force behind the Court's decision is a disagreement with the holding in *Bivens* itself.[10] There are at least two reasons why it is improper for the Court to allow its decision in this case to be influenced by that predisposi-

---

[10] See also *ante,* at 75 (SCALIA, J., concurring) (arguing that *Bivens* is a "relic of . . . heady days" and should be limited, along with *Carlson* v. *Green,* 446 U. S. 14 (1980), and *Davis* v. *Passman,* 442 U. S. 228 (1979), to its facts). Such hostility to the core of *Bivens* is not new. See, *e. g., Carlson,* 446 U. S., at 32 (REHNQUIST, J., dissenting) ("[T]o dispose of this case as if *Bivens* were rightly decided would in the words of Mr. Justice Frankfurter be to start with an 'unreality'"). Nor is there anything new in the Court's disregard for precedent concerning well-established causes of action. See *Alexander* v. *Sandoval,* 532 U. S. 275, 294–297 (2001) (STEVENS, J., dissenting).

tion.  First, as is clear from the legislative materials cited in *Carlson*, 446 U. S., at 19–20, see also *ante,* at 68, Congress has effectively ratified the *Bivens* remedy; surely Congress has never sought to abolish it.  Second, a rule that has been such a well-recognized part of our law for over 30 years should be accorded full respect by the Members of this Court, whether or not they would have endorsed that rule when it was first announced.  For our primary duty is to apply and enforce settled law, not to revise that law to accord with our own notions of sound policy.

I respectfully dissent.