# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WESTERN RADIO SERVICES CO.;
RICHARD L. OBERDORFER,
        *Plaintiffs-Appellants,*

v.

UNITED STATES FOREST SERVICE;
LARRY TIMCHAK; JIM MCMILLIN;
BOB ROCK; KRISTEN BAIL; JIM
SAUSER; DIANA HSIEH,
        *Defendants-Appellees.*

No. 08-35186

D.C. No.
04-CV-01346-AA

OPINION

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, Chief District Judge, Presiding

Argued and Submitted
May 7, 2009—Portland, Oregon

Filed August 21, 2009

Before: William A. Fletcher, Carlos T. Bea, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

---

### COUNSEL

Marianne Dugan, Eugene, Oregon, for the plaintiff-appellants.

Kevin Danielson, Portland, Oregon, for the defendants-appellees.

---

### OPINION

IKUTA, Circuit Judge:

Richard Oberdorfer and his company, Western Radio Services (collectively, "Western"), brought an action against the United States Forest Service and six of its officers under *Bivens v. Six Unknown Named Agents of the Bureau of Narcotics*, 403 U.S. 388 (1971),[1] and the Administrative Proce-

---

[1]*Bivens* was the first Supreme Court decision authorizing plaintiffs to bring claims for money damages against individual federal officials based on constitutional violations where no federal statute authorized such a suit; courts have subsequently referred to these as "*Bivens* claims."

dure Act (APA), Pub. L. 79-404, 60 Stat. 237 (1946). The district court dismissed the APA claims as moot and granted the government's motion for summary judgment on the *Bivens* claims, holding that the APA provided an adequate alternative remedy which foreclosed a remedy under *Bivens*. Western appeals only the dismissal of the *Bivens* claims. We agree with the district court that the APA provides Western an adequate alternative remedy, and we affirm.

I

Because this appeal comes to us from the grant of a motion for summary judgment, we relate the facts in the light most favorable to Western. *See Nolan v. Heald Coll.*, 551 F.3d 1148, 1150 (9th Cir. 2009).

Gray Butte is an 80-acre area within the Ochoco National Forest in central Oregon. The Forest Service leases various sites in the area to electronic communications companies, including Western and two other companies, Slater Communications and Electronics and Day Wireless Systems. Each lease agreement incorporates by reference the terms of the Forest Service's Gray Butte Electronic Site Management Plan, which "establish[es] a guide for the land manager to base decisions concerning the development of the site in conformance with" ten stated environmental objectives.

Western first constructed radio towers on Gray Butte in 1978, and it maintained good relations with the Forest Service for the first five years of its operations there. In 1986, Western began bringing administrative appeals of various Forest Service decisions. In 1993, Western filed several lawsuits challenging Forest Service permit and leasing decisions. After Western began challenging Forest Service decisions, it experienced unfavorable treatment from the Forest Service, including unexplained delays in processing its applications and rejections of its applications. On January 3, 1991, Western applied to the Forest Service for permission to place addi-

tional antennae on Gray Butte. Slater Communications objected, and Western submitted a revised application. Years later, in 1998, the Forest Service denied Western's application. Western appealed this denial, and in 1999 the Forest Service withdrew its denial and took Western's application back under consideration. More years passed, and in 2002 and 2003, Western pressed Forest Service officials to take action on its still-pending 1991 application. Between 2003 and 2007, there were communications between Western and various Forest Service officers, with the Forest Service continuing to request additional documents and clarifications and adding new procedural requirements to Western's application.

While Western was attempting to secure permission to install its side-hill antennae, Western also complained to the Forest Service regarding problems it was having with other Gray Butte lessees. In August 2000, Western informed a Forest Service officer that Slater Communications was not in compliance with the Site Plan, and that Slater Communications "would not allow inspection" by Western. Although Western believed other lessees operated equipment that did not "meet the technical standards" required by the applicable regulations and the Site Plan, Western was unable to specify the nature of the lessees' noncompliance because Western was unable to conduct its own inspection of the lessees' sites.

In August 2002, the Forest Service began the process of scheduling an inspection of Gray Butte. In response, Western again raised complaints about other lessees' noncompliance with the Site Plan. Western also asked the Forest Service to appoint representatives of other Gray Butte lessees, including Western, to the inspection team. In September 2002, the Forest Service inspected all three facilities at Gray Butte, but did not include lessees on its inspection team. The Forest Service found only minor deficiencies at Slater Communications and Day Wireless. Following this inspection, Western continued to send emails to the Forest Service accusing other lessees of noncompliance and demanding enforcement of the Site Plan.

On September 22, 2004, Western brought claims against the Forest Service and the individual defendants under *Bivens* and the APA, alleging that the defendants failed to stop other lessees' noncompliance with the Site Plan, failed to allow Western to conduct site inspections of other lessees' facilities, and delayed taking action on Western's application to install the two additional "side-hill" antennae on Gray Butte. Western claimed that these delays and inactions violated the First Amendment (by treating Western unfavorably in retaliation for its prior litigation against the Forest Service), the Fifth Amendment (by treating Western less favorably than the other lessees without a rational basis), and the APA (by unlawfully withholding or unreasonably delaying administrative action).

In January 2006, Western submitted a revised application seeking permission to construct four additional microwave antennae on the side-hill locations. The Forest Service prepared an environmental assessment for the proposal, and, on September 4, 2007, issued an administrative decision allowing Western to build two of the four proposed antennae. The district court then dismissed Western's APA inaction claims as moot because the agency had acted. The court also granted the defendants' motion for summary judgment on Western's *Bivens* claims, holding that the APA provided an adequate alternative remedy to a *Bivens* action.

Western appeals only the grant of summary judgment on his *Bivens* claims. Our review is de novo. *See Nolan*, 551 F.3d at 1150.

## II

**[1]** At the outset, we note that the Supreme Court has held that no *Bivens* remedy is available against a federal agency, *see FDIC v. Meyer*, 510 U.S. 471, 484 (1994), and on that ground we affirm the district court's dismissal of Western's *Bivens* claims against the Forest Service itself. We therefore turn to whether the circumstances of this case require us to

recognize an implied right of action under *Bivens* against the individual Forest Service officers for their alleged violations of Western's constitutional rights.

A

**[2]** In *Bivens*, the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1947 (2009). Specifically, the Court in *Bivens* allowed a plaintiff to bring a damages action in federal court against individual federal officials for violating the Fourth Amendment, despite the absence of any federal statute authorizing such an action. *See Bivens*, 403 U.S. at 397. Within the next few years, the Supreme Court extended Bivens in two additional cases where the Court concluded an implied right of action for money damages was consistent with congressional intent. In *Davis v. Passman*, the Court permitted a political appointee to bring a sex-discrimination claim against a congressman, despite the absence of such a remedy in Title VII of the Civil Rights Act of 1964, because there was no evidence that Congress intended to prevent political appointees from seeking relief under a judicially created remedy. 442 U.S. 228, 247 (1979). Similarly, in *Carlson v. Green*, the Court allowed a prisoner's action against prison officials for failure to provide proper medical attention in violation of the Eighth Amendment's prohibition against cruel and unusual punishment, notwithstanding the availability of a remedy under the Federal Tort Claims Act (FTCA), because there was evidence that Congress did not intend the FTCA to be a substitute for recovery under *Bivens*. 446 U.S. 14, 20 (1980).

**[3]** Since *Carlson*, however, the Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001). The Court has focused increased scrutiny on whether Congress intended the courts to

devise a new *Bivens* remedy, and in every decision since *Carlson*, across a variety of factual and legal contexts, the answer has been "no." *See, e.g.*, *Chappell v. Wallace*, 462 U.S. 296, 297 (1983) (declining to allow an implied right of action for military personnel who allegedly suffered racial discrimination at the hands of their superior officers); *Bush v. Lucas*, 462 U.S. 367, 368 (1983) (declining to allow an implied right of action for a federal civil-service employee who allegedly suffered unconstitutional employment actions); *Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988) (declining to allow an implied right of action for disabled persons who were allegedly denied Social Security disability benefits in violation of their due process rights); *Wilkie v. Robbins*, 551 U.S. 537, 561-62 (2007) (declining to allow an implied right of action for a landowner who allegedly suffered harassment and intimidation by federal officials in violation of his rights under the Fourth and Fifth Amendments).

**[4]** In *Wilkie*, the Court distilled its 35-year history of *Bivens* jurisprudence into a two-step analysis for determining congressional intent as to the appropriateness of a *Bivens* remedy. *See id.* at 550. First, the Court determines whether there is "any alternative, existing process for protecting" the plaintiff's interests. *Id.* Such an alternative remedy would raise the inference that Congress "expected the Judiciary to stay its *Bivens* hand" and "refrain from providing a new and freestanding remedy in damages." *Id.* at 550, 554. The Court has explained that, "[w]hen the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies." *Chilicky*, 487 U.S. at 423; *see also Castaneda v. United States*, 546 F.3d 682, 701 (9th Cir. 2008). Accordingly, the Court has refrained from creating a judicially implied remedy even when the available statutory remedies "do not provide complete relief" for a plaintiff that has suffered a constitutional violation. *Corr. Servs. Corp.*, 534 U.S. at 69 (quoting *Bush*, 462 U.S. at 388). "So long as the

plaintiff ha[s] an avenue for some redress, bedrock principles of separation of powers foreclose[s] judicial imposition of a new substantive liability." *Id.*

We have interpreted these cases as holding that, "[s]o long as Congress' failure to provide money damages, or other significant relief, has not been inadvertent, courts should defer to its judgment." *Berry v. Hollander*, 925 F.2d 311, 314 (9th Cir. 1991) (internal quotation marks omitted); *accord Adams v. Johnson*, 355 F.3d 1179, 1185 n.3 (9th Cir. 2004) (explaining that the adequate alternative remedy "need not be perfectly comprehensive"). In *Chilicky*, for example, the Court declined to create a *Bivens* action for recovery of money damages for "emotional distress and for loss of food, shelter and other necessities" caused by the wrongful denial of Social Security benefits. 487 U.S. at 419, 426. The Court reasoned that the existence of a comprehensive and elaborate remedial scheme for wrongly withheld Social Security disability benefits evinced a "congressional unwillingness to provide consequential damages for unconstitutional deprivations" of those benefits. Because Congress "provide[d] meaningful safeguards or remedies" for the plaintiffs, and because "personal liability for official acts" would "undoubtedly lead to new difficulties and expense in recruiting administrators for the programs Congress has established," the Court held that Congress had implicitly foreclosed a *Bivens* remedy even though it had not provided complete relief to the plaintiffs. *Id.* at 425.

[5] Second, if the Court cannot infer that Congress intended a statutory remedial scheme to take the place of a judge-made remedy, the Court next asks whether there nevertheless are "factors counseling hesitation" before devising such an implied right of action. *Wilkie*, 551 U.S. at 550. Even where Congress has given plaintiffs no damages remedy for a constitutional violation, the Court has declined to create a right of action under *Bivens* when doing so "would be plainly inconsistent with Congress' authority in this field." *Chappell*, 462 U.S. at 304. In *Chappell*, for example, enlisted military per-

sonnel had no damages remedy of any kind against their superiors for constitutional violations, but the Court nevertheless declined to create a damages remedy under *Bivens*. 462 U.S. at 301. The Court explained that "the unique disciplinary structure of the Military Establishment and Congress' activity in the field constitute 'special factors' which dictate that it would be inappropriate to provide enlisted military personnel a *Bivens*-type remedy against their superior officers." *Id.* at 304.

The Court also found "special factors counselling hesitation" in *Wilkie*, and accordingly declined to create a *Bivens* remedy. 551 U.S. at 550. In *Wilkie*, a ranch owner claimed that officers of the Bureau of Land Management tried to coerce him into granting the federal government an easement over his land. The ranch owner alleged that Bureau officials trespassed on his property; broke into his lodge and left trash inside; videotaped his vacationing clients from a hilltop while they "sought privacy to relieve themselves"; revoked the grazing permit and special-use permit that allowed him to "run guest cattle drives"; levied fines against him for trespassing on federal land; convinced the local United States Attorney's office to bring a meritless criminal prosecution against him; and tried to convince the local sheriff to impound his cattle. *Id.* at 542-47. The ranch owner therefore brought *Bivens* claims against the officers, alleging that they violated his Fourth and Fifth Amendment rights by "retaliating against the exercise of [his] ownership rights." *Id.* at 549.

In the first step of its *Bivens* analysis, the Court examined whether there was "any alternative, existing process" available to the ranch owner, and broke his claims "into four main groups: torts or tort-like injuries inflicted on him, charges brought against him, unfavorable agency actions, and offensive behavior by Bureau employees falling outside those three categories." *Id.* at 551. Addressing the criminal charges, the Court concluded that, "[f]or each charge," the plaintiff "had some procedure to defend and make good on his position . . .

although he had mixed success, he had the means to be heard." *Id.* at 552. Addressing the unfavorable agency actions, the Court concluded that, "[f]or each claim, administrative review was available, subject to ultimate judicial review under the APA." *Id.* The Court further concluded that the plaintiff had some type of remedy in tort for the alleged trespasses and vandalism, though noting some uncertainty as to whether a remedy was available against the officers' videotaping of his guests. *Id.* at 553. In sum, the Court concluded that the plaintiff had "an administrative, and ultimately a judicial, process for vindicating virtually all of his complaints." *Id.*

Nonetheless, the Court held that the case could not be disposed of at step one of its *Bivens* analysis because "the forums of defense and redress" were "a patchwork, an assemblage of state and federal, administrative and judicial benches applying regulations, statutes and common law rules." *Id.* at 554. Thus, the Court stated, "[i]t would be hard to infer that Congress expected the Judiciary to stay its *Bivens* hand, but equally hard to extract any clear lesson that *Bivens* ought to spawn a new claim." *Id.* The Court therefore concluded that *Wilkie* was a case "for *Bivens* step two, for weighing reasons for and against the creation of a new cause of action, the way common law judges have always done." *Id.* The Court explained that it must "make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counseling hesitation before authorizing a new kind of federal litigation." *Id.* at 550 (quoting *Bush*, 462 U.S. at 378).

In the second step of this two-step analysis, the Court noted that the plaintiff's allegation amounted to the claim that the officers had pushed too hard on the government's behalf, and the Court reasoned that it would be too difficult to draw a line between "legitimately hard bargaining" and "illegitimate pressure." *Id.* at 562. In light of the "serious difficulty of devising a workable cause of action," the Court concluded that "a gen-

eral *Bivens* cure would be worse than the disease," and therefore held that the plaintiffs had no implied right of action for damages under *Bivens*. *Id.* at 561.

B

Applying *Wilkie*'s two-step analysis to this case, we begin by asking whether the existence of "any alternative, existing process" available to Western, or other indication of Congressional intent, raises the inference that Congress "expected the Judiciary to stay its *Bivens* hand." *Id.* at 550, 554.

**[6]** At the outset, we note that *Wilkie* itself gave us a strong indication that the APA constitutes an "alternative, existing process" for Western's damages claims based on agency actions and inactions. The Court in *Wilkie* observed that the ranch owner had an adequate remedy for the "unfavorable agency actions," because, "[f]or each [such] claim, administrative review was available, subject to ultimate judicial review under the APA." *Id.* at 552.[2] *Wilkie* moved on to step two because the plaintiff had only a patchwork of different remedies for addressing the other, non-administrative claims. *Id.* at 554.

**[7]** Although *Wilkie* does not explain in detail how it determined that the APA was an adequate alternative remedy for unfavorable agency actions, our own consideration of the APA leads to the same conclusion. The APA expressly declares itself to be a comprehensive remedial scheme: it states that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial

---

[2]The specific final agency actions in *Wilkie* were the Bureau's cancellation of the ranch owner's right-of-way, its decision to reduce the length of the special recreational use permit from five years to one and subsequent termination of that permit, and its revocation of his cattle-grazing permit. *Id.* at 552-53.

review," 5 U.S.C. § 702, and then sets forth the procedures for such review, *see id.* §§ 704, 706. "The APA's comprehensive provisions . . . allow any person 'adversely affected or aggrieved' by agency action to obtain judicial review thereof, so long as the decision challenged represents a 'final agency action for which there is no other adequate remedy in a court.' " *Webster v. Doe*, 486 U.S. 592, 599 (1988) (quoting 5 U.S.C. §§ 701-06). Specifically, the APA authorizes a reviewing court to:

> (1) compel agency action unlawfully withheld or unreasonably delayed; and

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] (B) contrary to constitutional right, power, privilege, or immunity . . . .

5 U.S.C. § 706(1)-(2); *see also Darby v. Cisneros*, 509 U.S. 137, 143-47 (1993) (discussing the provisions and structure of the judicial-review sections of the APA). Like the "administrative structure and procedures of the Social Security system" at issue in *Chilicky*, the APA is vast in scope and affects "virtually every American." 487 U.S. at 424. Indeed, the APA is, by its nature, broader in scope than the Social Security system: absent some statutory or other exception, the APA's "comprehensive provisions" provide the backup or default remedies for all interactions between individuals and all federal agencies, not just the Social Security Administration. 5 U.S.C. §§ 702, 704; *Webster*, 486 U.S. at 599. The fact that APA's procedures are available where no other adequate alternative remedy exists further indicates Congress's intent that courts should not devise additional, judicially crafted default remedies. *See* 5 U.S.C. § 704.

The APA does not provide for monetary damages, though it does allow "specific relief," including the payment of

money to which a plaintiff is entitled. *Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988). Nor does the APA allow claims against individuals or provide a right to a trial by jury. Both the Supreme Court and this court have concluded, however, that remedial schemes lacking such features may be adequate alternatives, provided that the absence of such procedural protections was not inadvertent on the part of Congress. *See Chilicky*, 487 U.S. at 424-25; *Libas Ltd. v. Carillo*, 329 F.3d 1128, 1129 (9th Cir. 2003) (holding that no *Bivens* remedy was available where a statutory scheme allowed importers to challenge customs agents' erroneous assessments of import duties but did not provide for consequential damages or a right of action against the individual agents); *Janicki Logging Co. v. Mateer*, 42 F.3d 561, 564-65 (9th Cir. 1994) (holding that the Contract Dispute Act provided an adequate alternative remedy to a *Bivens* action, even though it did not provide for damages claims against individual officers or the right to a jury trial).

**[8]** In sum, the design of the APA raises the inference that Congress "expected the Judiciary to stay its *Bivens* hand" and provides "a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages," *Wilkie*, 551 U.S. at 550, 554, notwithstanding the unavailability of money damages against individual officers or the right to a jury trial. With respect to agency action and inaction, we conclude that Congress "has considered the universe of harms that could be committed in the program's administration and has provided what Congress believes to be adequate remedies." *Adams*, 355 F.3d at 1185. We therefore conclude that the APA leaves no room for *Bivens* claims based on agency action or inaction.

C

This conclusion resolves Western's claims. Western alleges that the individual defendants were responsible for the Forest Service's denial of Western's application to place additional

radio antennae on Gray Butte and its failure to take administrative action against other site lessees when it was required by the Site Plan to do so. Provided Western complied with the APA's procedural requirements, *see* 5 U.S.C. § 704, such agency actions and inactions could be challenged under the APA, *see id.* at § 706(1)-(2); *see also Wilkie*, 551 U.S. at 552; *Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 979, 983-84 (9th Cir. 2006) (reviewing Forest Service action under the APA). In light of Congress's provision of an adequate statutory remedial scheme, and because Congress could reasonably conclude that limitations on the available remedies were appropriate in this context, we conclude that Western cannot maintain its *Bivens* claims against the individual defendants for causing the Forest Service's alleged actions and inactions.

Western does not dispute that it has alternative remedies under the APA; it did, after all, bring APA claims against the Forest Service in this case. But Western raises several arguments as to why we should nevertheless allow it an implied right of action.

First, Western points to our decision in *Castaneda*, where we followed the Supreme Court's precedent in *Carlson* and held that the FTCA did not preclude a *Bivens* action for a prisoner alleging violations of his Eighth Amendment rights by prison officials. *See* 546 F.3d at 688. We noted various deficiencies in the FTCA's remedial scheme, and Western argues that *Carlson* and *Castaneda* are controlling because the APA has the same deficiencies. We disagree. In analyzing whether the FTCA was an inadequate alternative remedy, *Castaneda* mentioned the unavailability of monetary damages against individuals and lack of a right to a jury trial. *Id.* at 689-90. But as we have already explained, the case law of the Supreme Court and this court makes clear that a remedial scheme may be adequate even if it does not include these elements. *See Chilicky*, 487 U.S. at 424-25, *Libas Ltd.*, 329 F.3d at 1129. *Castaneda*'s decision to allow a *Bivens* claim in the Eighth

Amendment context was thus driven primarily by a unique deficiency in the FTCA: its authorization of only those actions allowed by "the law of the place where the act or omission occurred." *Id.* at 690. As we explained:

> [T]he remedies we and the Supreme Court have held to preclude *Bivens* were deliberately crafted by Congress and applied uniformly throughout the republic. We are aware of no case holding a remedial scheme that is entirely parasitic on state law to be a substitute for a *Bivens* remedy.

*Castaneda*, 546 F.3d at 690. No such concern is present with the APA, a freestanding federal statute that applies uniformly throughout the country. Because the APA's remedial scheme does not share the FTCA's lack of uniformity, *Castaneda* is not controlling.

Second, Western cites *Carlson*'s analysis of congressional intent. In *Carlson*, the Court concluded that Congress did not intend for the FTCA to be a substitute for *Bivens* because the FTCA had already been enacted when *Bivens* was decided. Moreover, *Carlson* noted that a post-*Bivens* amendment to the FTCA did not include a statement of congressional intent to create a substitute for *Bivens*. Western points to the fact that the APA, like the FTCA, predated *Bivens*, and that Congress similarly failed to address *Bivens* in a post-*Bivens* amendment to the APA. According to Western, this legislative history compels the inference that Congress did not intend the APA to be a substitute for Bivens.

Again, we disagree. *Carlson* did not rely only on congressional silence in post-*Bivens* amendments to the FTCA; rather, *Carlson* noted that "the congressional comments accompanying that amendment made it *crystal clear* that Congress views FTCA and *Bivens* as parallel, complementary causes of action." 446 U.S. at 19-20 (emphasis added). The Court quoted legislative history expressly stating that the

FTCA "should be viewed as a counterpart to the *Bivens* case." *Id.* at 20 (quoting S. Rep. No. 93-588, p. 3 (1973)). Western points to no similar indications of congressional intent with respect to the APA. Both the Supreme Court and this court have often declined to create *Bivens* actions to supplement statutory remedies, even in situations where Congress gave no affirmative indication that it intended to preclude judge-made relief. *See, e.g.*, *Chilicky*, 487 U.S. at 425-26; *Bush*, 462 U.S. at 378; *Adams*, 355 F.3d at 1185; *Libas Ltd.*, 329 F.3d at 1129; *Janicki Logging*, 42 F.3d at 564-65; *Berry*, 925 F.2d at 315-16. Congress's silence in post-*Bivens* amendments to the APA does not raise the inference that it intended to allow an implied right of action.

Finally, Western argues that *Wilkie* is distinguishable from this case because here the individual defendants' alleged misdeeds were the result of illegitimate motives. Western claims that the individual officers' misdeeds were based on an illegitimate desire to retaliate against Western for exercising its First Amendment right to petition the government for redress of grievances and to discriminate against Western without a rational basis. In *Wilkie*, by contrast, the Court refrained from creating a *Bivens* remedy due to concerns about the "difficulty in defining a workable cause of action" against government employees for overzealous conduct based on *legitimate* motivations. 551 U.S. at 555-56 ("[U]nlike punishing someone for speaking out against the Government, trying to induce someone to grant an easement for public use is a perfectly legitimate purpose."). Because such "line-drawing difficulties" are not present here, *id.* at 557, Western argues that *Wilkie* does not prevent us from allowing it a right of action under *Bivens*.

Western's argument misunderstands *Wilkie*, which considered the defendants' legitimate motives at the second stage of its two-step inquiry. In step one of the analysis, the Court concluded that the alternative remedies available to the plaintiff were "a patchwork" and therefore inadequate. *Id.* at 554. The Court then moved on to "*Bivens* step two," in which it consid-

ered whether there were "special factors counselling hesitation before authorizing a new kind of federal litigation" and "weigh[ed] reasons for and against the creation of a new cause of action." *Id.* at 550, 554. Only at step two did the Court consider the legitimacy of the defendants' motives. In the present case, our analysis ends at step one: we have determined that the APA is an adequate alternative remedy for Western's claims, and we therefore have no need to "weigh[ ] reasons for and against the creation of a new cause of action." *Wilkie*, 551 U.S. at 554.

## III

**[9]** Because Western's claims against the individual defendants are based on Forest Service actions or inactions, we conclude that the remedies available to Western under the APA constitute an "alternative, existing process" that "amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Id.* at 550. Western's alternative remedies under the APA, although not perfectly comprehensive, are adequate. *Id.* at 543; *Adams*, 355 F.3d at 1185 n.3. This conclusion ends our two-step *Bivens* analysis, and so we need not determine whether a *Bivens* right of action is applicable to a claim alleging a violation of the First Amendment. *See Iqbal*, 129 S. Ct. at 1948 (noting prior decision refusing to extend *Bivens* to First Amendment claims, but declining to reach the issue).

**AFFIRMED.**

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON REUTERS/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2009 Thomson Reuters/West.