Judge CHIN dissents in a separate opinion.
DEBRA ANN LIVINGSTON, Circuit Judge:
Jane Doe is a former United States Military Academy (“West Point”) cadet who alleges that during her second year at West Point, she was sexually assaulted by a fellow cadet. She filed this lawsuit not against the cadet, but against two superior officers, Lieutenant General Franklin Lee Hagenbeck and Brigadier General William E. Rapp, in their personal capacities. Lieutenant General Hagenbeck was Superintendent of West Point from approximately July 2006 to July 2010, and in that role he chaired the Sexual Assault Review Board, which is the “primary means of oversight” of the sexual assault prevention and response program at West Point. Joint App’x 12. Brigadier General Rapp was Commandant of Cadets at West Point from 2009 to 2011 and was in charge of the administration and training of cadets. Doe alleges, in substance, that Lieutenant General Ha-genbeck and Brigadier General Rapp “perpetrat[ed] a sexually aggressive culture” at West Point that “discriminated against female cadets,” “put female cadets at risk of violent harm,” and resulted, inter alia, in her sexual assault. Id. at 29.
In 2013, Doe filed suit against the United States, Lieutenant General Hagenbeck, and Brigadier General Rapp. She pleaded four causes of action, but the district court dismissed all but one: a claim against Lieutenant General Hagenbeck and Brigadier General Rapp brought pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), on the basis of their alleged violation of equal protection rights protected by the Fifth Amendment. For the reasons stated below, we conclude that the district court erred in permitting this Bivens claim to proceed. We therefore REVERSE the order of the district court as to this claim and REMAND the case to the district court with instructions to dismiss it.
BACKGROUND
I, Factual Allegations[1]
Doe, who graduated from high school in 2008, received an offer of admission to *39 West Point during her senior year, which she accepted. As a West Point cadet, Doe was a member of the Army. 10 U.S.C. § 3075(b)(2). The expectation upon enrollment was that, following her military training and education at West Point— which, together with room and board, Doe received without charge—she would serve at least five years of active duty. The West Point curriculum, as Doe alleges in her Amended Complaint, “is designed to train ‘officer-leaders of character to serve the Army and the Nation.’” Joint App’x 13.
Upon arrival at West Point, Doe, who was one of about 200 women among the approximately 1,300 cadets in her class, alleges that she encountered what she describes as a “male” and “misogynistic culture.” Id. at 14, 15. Cadets, for example, sang sexually explicit and offensive chants while marching on campus, “in view and earshot of faculty and administrators.” Id. at 16. Doe contends that she “observed her cadet classmates making misogynistic and sexually aggressive comments on a regular basis,” while “[t]he West Point administration frequently ignored and sometimes condoned these comments.” Id. at 15. Doe does not allege that Lieutenant General Hagenbeck or Brigadier General Rapp engaged in any such conduct, but she does contend that they “created” the culture there, which “marginalized” Doe and other female cadets and “caused them to be subjected to routine harassment, [to]' suffer emotional distress and other harms, and [to] be pressured to conform to male norms.” Id. Doe also maintains that West Point’s training on sexual assault and harassment was inadequate “and did little to combat the overwhelmingly misogynistic culture of the school.” Id. at 17.
In the early morning of May 9, 2010, during her second year at West Point, Doe alleges that she was raped by a fellow cadet with whom she had gone walking after hours. In particular, Doe asserts that after taking a prescribed sedative as she was preparing for bed, she agreed at about 1:00 a.m. to leave her dormitory with this cadet (identified by Doe in her Amended Complaint only as “Mr. Smith” (“Smith”)) in violation of West Point rules. Doe alleges that she accepted only a few sips of alcohol from Smith but that, as a result of the combined effects of the sedative and the alcohol, she “began to lose awareness of her surroundings and consciousness of what she was doing.” Id. at 22. Doe contends that Smith “was aware that [she] had lost consciousness and took advantage,” attacking her and having “forcible, non-consensual intercourse with her.” Id. She also maintains that she does not remember the details of the attack.
Doe sought care from West Point’s cadet health clinic the next day, which provided her with emergency contraception and, on a subsequent visit on or about May 11, tested her for sexually-transmitted diseases. Although the treating nurse allegedly informed Doe that she had signs of vaginal tearing, and the medical record indicates Doe reported that she “was sexually assaulted by a friend,” Doe states that the clinic “did not perform any forensic collection or preservation of evidence of the sexual assault.” Id. at 23. During a regular appointment with her psychiatrist that day (a psychiatrist Doe began consulting, she alleges, because of the significant *40 stress she suffered due to West Point’s oppressive atmosphere), Doe reported “nonconsensual sexual relations with a friend,” and was referred to West Point’s Sexual Assault Response Counselor, Major Maria Burger, Id.
Doe met only once with Major Burger. During that meeting, the major explained to Doe that she could file either an “unrestricted” or a “restricted” report about the incident. Id.- An unrestricted report would have included both Doe’s and her alleged assailant’s names and would have been given to commanders for potential disciplinary action. A restricted report would preserve their anonymity, but would not result in a referral. Doe filed a restricted report. She alleges in her Amended Complaint that she feared reputational harm or even retaliation from other cadets if she’ filed an unrestricted report. She also worried that she would be punished for having been out after hours and for consuming alcohol with her alleged assailant, and that an unrestricted report would damage her career prospects because “[i]t was common knowledge among the cadets that successful women in the military did not report incidents of sexual assault.” Id.
Doe contends that in the aftermath of the sexual assault, her anxiety grew intolerable, Doe informed West Point that she would resign, and on August 13, 2010, she was honorably discharged. Doe thereafter enrolled in a civilian college from which she earned a degree.
II. Procedural History
On April 26, 2013, Doe filed a complaint in the United States District Court for the Southern District of New York (Heller-stein, J.)[2] On September 4, 2013, she filed an Amended Complaint. Therein, Doe pleaded four independent causes of action: (1) a Bivens claim based on an alleged Fifth Amendment due process violation against Lieutenant General Hagenbeck and Brigadier General Rapp; (2) a Bivens claim premised on an alleged Fifth Amendment equal protection .violation against Lieutenant General Hagenbeck and Brigadier General Rapp; (3) a claim for breach of the covenant of good faith and fair dealing under 28 U.S.C, § 1346(a)(2) (the “Little Tucker Act”) against the United States; and (4) a Federal Tort Claims Act (“FTCA”), 28 U.S.C. §§ 1346(b), 2671-2680, claim against the United States alleging negligent supervision, negligent training, negligence, negli *41 gent infliction of emotional distress, and abuse of process.
On September 20, 2013, defendants filed a motion to dismiss the Amended Complaint, which Doe' opposed. On April 13, 2015, the district court issued an opinion and order granting in part and denying in part defendants’ motion: The district court granted defendants’ motion as to the two claims against the United States: the Little Tucker Act claim and the FTCA claim. The district court also dismissed Doe’s Bivens claim asserting a violation of her due process rights; These claims are not at issue in this interlocutory appeal.
The district court denied the motion to dismiss as to the Bivens claim in which Doe asserted that Lieutenant General Hagenbeck and Brigadier General Rapp violated her equal protection rights. The district court acknowledged that a Bivens remedy is not available “when ‘special factors counselling hesitation’ are present,” Chappell v. Wallace, 462 U.S. 296, 298, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (quoting Bivens, 403 U.S. at 396, 91 S.Ct. 1999). It recognized that absent Congressional authorization for a money damages claim, “[t]he need to insulate the military’s disciplinary structure from judicial inquiry” constitutes a special factor. Doe v. Hagenbeck, 98 F.Supp.3d 672, 684 (S.D.N.Y. 2015). Further, the court acknowledged the Supreme Court’s instruction, in United States v. Stanley, that in the military context, _ the special factors requiring abstention “extend [even] beyond the situation in which an officer-subordinate relationship exists, and require abstention in the inferring of Bivens actions as extensive as the exception to the FTCA” established in Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), Stanley, 483 U.S. 669, 683-84, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987). In the district court’s view, however, “the primary reason for exercising judicial restraint with cases concerning the' military is ‘the need to' preserve the military disciplinary structure and prevent judicial involvement in sensitive military matters.’ ” Doe, 98 F.Supp.3d at 688 (quoting Wake v. United States, 89 F.3d 53, 57 (2d Cir. 1996)). The district' court concluded that Doe’s claim, at least at the motion to dismiss stage, did not implicate such concerns.
Following the district- court’s opinion, Lieutenant General Hagenbeck and Brigadier General Rapp filed a notice of interlocutory appeal and moved for a stay pending the appeal. In response, Doe argued that any appeal should be pursued in the Federal Circuit instead of in the Second Circuit. The district court granted the stay until August' 7, 2015, “and such further period as the U.S. Court of Appeals shall determine.” Joint App’x 9. The district court also “note[d] Plaintiffs position that any appeal should be pursued in the Federal Circuit[] instead of the Second Circuit” and “le[ft] that determination for the appellate courts.” Id. A panel of this Court thereafter granted defendants’ motion to stay the proceedings before the district court and denied Doe’s motion to transfer venue.
DISCUSSION
Doe’s équal protection claim is based on the proposition that Lieutenant General Hagenbeck and Brigadier General Rapp, her superior officers at the time, “knowingly and intentionally created , and enforced a policy and practice” at West Point that “discriminated against female cadets,” “tolerated attacks against [them] and discouraged reporting,” and promoted a'“sexually aggressive culture” there that caused Doe to suffer, inter alia, a sexual assault. Joint App’x 29. The district court denied defendants’ motion to dismiss this *42 claim, concluding it should be permitted to proceed “unless it is evident from the complaint, or shown by an answer and subsequent proofs, that military discipline or its command structure is compromised.” Doe, 98 F.Supp.3d at 689. We review the district court’s determination de novo. Warney v. Monroe Cty., 587 F.3d 113, 120 (2d Cir. 2009).
In reviewing the denial of a motion to dismiss, we assume that the allegations in Doe’s Amended Complaint are. true and draw all reasonable inferences from those allegations in her favor. Starr Int’l Co. v. Fed. Reserve Bank, 742 F.3d 37, 40 (2d Cir. 2014). Assuming their truth, Doe’s allegations of harassment and abuse are no credit to West Point, an institution founded, as Doe alleges, “to train ‘officer-leaders of character to serve the Army and the Nation.’ ” Joint App’x 13. But this neither does nor should end the judicial inquiry into whether Doe’s Bivens claim may proceed.
Doe seeks to hold her superior officers personally liable for money damages in connection with their decisions regarding the training, supervision, discipline, education, and command of service personnel at West Point, an officer training school and military base. But Congress, “the constitutionally authorized source of authority over the military system of justice, has not provided a damages remedy” for the constitutional claim that Doe asserts. Chappell, 462 U.S. at 304, 103 S.Ct. 2362. The Supreme Court, citing the “inescapable demands of military discipline ... [that] cannot be taught on battlefields,” id. at 300, 103 S.Ct. 2362, has held, unanimously, that absent Congressional authorization, “it would be inappropriate [for courts] to provide enlisted military personnel a Bivens-type remedy against their superior officers.” Id. at 304, 103 S.Ct. 2362; see also id. at 305, 103 S.Ct. 2362 (holding that “enlisted military personnel may not maintain a suit to recover damages from a superior officer for alleged constitutional violations”). We conclude that Chappell and its progeny are dispositive of Doe’s Bivens claim and, accordingly, that the district court erred in determining that Doe’s Bivens claim may proceed.
I
We start with Bivens itself. In Bivens, the Supreme Court permitted the plaintiff, who alleged that he had been subjected to an unlawful, warrant-less search of his home and to an unlawful arrest, to proceed with a Fourth Amendment damages claim against allegedly errant federal law enforcement agents, despite the fact that Congress had not provided for such a remedy. 403 U.S. at 389, 395-97, 91 S.Ct. 1999. Although the Bivens Court permitted this damages claim to proceed, it signaled, as the Court has repeatedly cautioned since, that “such a remedy will not be available when ‘special factors counselling hesitation’ are present.”[3] Chappell, 462 U.S. *43 at 298, 103 S.Ct. 2362 (quoting Bivens, 403 U.S. at 396, 91 S.Ct. 1999). The Court has since made clear that it is “reluctant to extend Bivens liability ‘to any new context or new category of defendants.’ ” Ashcroft v. Iqbal, 656 U.S. 662, 675, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 68, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001)). In the forty-six years since Bivens was decided, the Supreme Court has extended the precedent’s reach only twice,[4] and it has otherwise consistently declined to broaden Bivens to permit new claims.[5] See Ziglar v. Abbasi, — U.S. -, 137 S.Ct. 1843, 1857, 198 L.Ed.2d 290 (2017) (observing that “the Court has made clear that expanding the Bivens remedy is now a ‘disfavored’ judicial activity,” and collecting cases in which the Supreme Court has refused to do so (quoting Iqbal, 556 U.S. at 675, 129 S.Ct. 1937)). Indeed, noting that “it is a significant step under separation-of-powers principles for a court to determine that it has the authority,” in effect, “to create and enforce a cause of action for [money] damages against federal officials,” the Court only recently observed that “it is possible that the analysis in the Court’s three Bivens cases might have been different if they were decided today.” Id. at 1856.
The Supreme Court’s separation-of-powers concern with implied causes of action under the Constitution, present in all cases in which plaintiffs have sought to extend Bivens’s reach, is particularly acute in the military context. In Chappell, the Supreme Court held that special factors counselled against permitting the plaintiffs—enlisted Navy sailors who alleged that superior officers had discriminated against them on the basis of race—to maintain Bivens money damage claims. 462 U.S. at 297, 304, 103 S.Ct. 2362. Referencing the “centuries of experience” reflected in the military’s “hierarchical structure of discipline and obedience to command,” a structure “wholly different from civilian patterns,” id. at 300, 103 S.Ct. 2362, the Court concluded that civilian courts, not responsible for the lives of soldiers and “ill-equipped to determine the impact upon discipline” of their intrusions, id. at 305, 3.03 S.Ct. 2362 (quoting Earl Warren, The Bill of Rights and the Military, 37 N.Y.U. L. Rev. 181, 187 (1962)), must “hesitate long” before entertaining suits which ask courts to “tamper with the established relationship between enlisted military personnel and their superior officers,” id. at 300, 103 S.Ct. 2362. Congress, the Court unanimously said, has “plenary control over rights, duties, and responsibilities in the framework of the *44 [military [establishment, including regulations, procedures and remedies related to military discipline.” Id. at 301, 103 S.Ct. 2362. In the absence of Congressional action, the-Court, concluded, “enlisted military personnel may not maintain a suit to recover damages from, a superior officer for alleged constitutional violations.” Id. at 305, 103 S.Ct. 2362.
The Supreme Court was, if anything, even more emphatic in Stanley. The Court ruled there that the plaintiff—a former soldier alleging that the Army had secretly given him, doses of LSD to study the drug’s effects—could not maintain a Bivens action, even though at least some of the defendants in the case were not, Stanley’s superior military officers (thus not directly implicating Chappell’s chain-of-command concerns) and “may well have been civilian personnel.” 483 U.S. at 679, 107 S.Ct. 3054; see. id. at 671, 680-84, 107 S.Ct. 3054. Citing by way of analogy to its decision in Feres, which established that “the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service,” 340 U.S. at 146, 71 S.Ct. 153, the Stanley Court explained that there is no “reason why [its] judgment in the Bivens context should be any less protective of military concerns than it has been with respect to FTCA suits, where [it] adopted [the] ‘incident to service’ rule,” 483 U.S. at 681, 107 S.Ct. 3054. The Court thus concluded—in sweeping language—that in the military context, even where no “officer-subordinate relationship exists,” the reach of the special factors counselling “abstention in the inferring of Bivens actions” is “as extensive as thé exception to the FTCÁ established by Feres.” Id. at 683-84, 107 S.Ct. 3054. Accordingly, pursuant to the incident-to-service rule, “no Bivens remedy is available for injuries that ‘arise out of or are in the course of activity incident to service.’ ” Id. at 684, 107 S.Ct. 3054 (quoting Feres, 340 U.S. at 146, 71 S.Ct. 153).
II
This Supreme Court precedent frames our inquiry and leads ineluctably to the conclusion that Doe cannot maintain her Bivens claim. Doe was a member of the military at the time the events giving rise to her claim occurred, and the claim concerns superior officers. Further, her claim calls into question “basic choices about the discipline, supervision, and control” of service personnel and would “require[] the civilian court to second-guess military decisions,” thus triggering the incident-to-service rule.[6] United States v. Shearer, 473 U.S. 52, 57-58, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985) (noting that allegations “go[ing] directly to the ‘management’ of the military” that “might impair essential military discipline” he at the “core” of rule’s concerns). In such circumstances, her Bivens claim must be dismissed.
*45 , At the start, by statute, a West Point cadet is a member of the military. “The Regular Army is [a] component of the Army” and “includes ... cadets of the United States Military Academy,” 10 U.S.C. § 3075, who swear an oath to “at all times obey the legal orders of [their] superior officers, and the Uniform, Code of Military Justice,” id. § 4346(d). For this reason, in the context of the FTCA, courts citing Feres have reliably applied the doctrine of intramilitary immunity to bar suits brought by service academy cadets whenever such suits implicate the incident-to-service rule. See, e.g., Miller v. United States, 42 F.3d 297, 301, 308 (5th Cir. 1995); Collins v. United States, 642 F.2d 217, 218 (7th Cir. 1981). This Circuit, moreover, has recognized that the rule also applies in the context of suits brought by students who are part of the Reserve Officer Training Corps at nonmilitary schools. See Wake, 89 F.3d at 55, 58-59, 62.
Next, Doe’s alleged injuries clearly are covered by the Supreme Court’s holding in Stanley that “no Bivens remedy-is available for injuries that ‘arise out of or are in the course of activity incident to service.’.” 483 U.S. at 684, 107 S.Ct. 3054. (quoting Feres, 340 U.S. at 146, 71 S.Ct. 153). As the Supreme Court recognized in Shearer when applying the incident-to-service rule, when a claim on its face “requires the civilian court to second-guess military decisions,” and when the complaint, fairly read, calls into question “the ‘management’ of the military”—that is, “basic choices about the discipline, supervision, and control” of service personnel—we are “at the core” of the rule’s concerns. 473 U.S. at 57-58, 105 S.Ct. 3039. In such circumstances, we do not inquire into “the extent to which particular suits would call into question military discipline. and. decision-making.” Stanley, 483 U.S. at 682, 107 S.Ct. 3054. Instead, such cases “require abstention,” id. at 683, 107 S.Ct. 3054, so as to avoid..interference with “the necessarily unique structure of the military establishment” and to defer to the Framers who, “well aware of the differences between [military] and civilian life” and cognizant of the issues that might in future arise, granted “plenary authority to Congress ... ‘[t]o make Rules for the Government and Regulation of the land and naval Forces,”’ Chappell, 462 U.S. at 300-01, 103 S.Ct. 2362 (emphasis added) (quoting U.S, Const, art. 1, § 8, cl. 14). '
Here, in considering whether Doe’s injuries occurred “incident to service,” we examine the specific factual allegations that underlie her equal protection claim,[7] See Klay v. Panetta, 758 F.3d 369, 375 (D.C. Cir. 2014) (noting that the incident-to-service rule bars Bivens claims when litigating “the plaintiff’s theory of the ease” *46 would, in effect, “require military leaders to defend their professional management choices”). The allegations in Doe’s Amended Complaint do not merely invite, but require a most wide-ranging inquiry into the commands of Lieutenant General Ha-genbeck and Brigadier General Rapp. Specifically, as they relate to these defendants’ conduct, Doe’s allegations center on the implementation and supervision of allegedly inadequate and harmful training and education programs relating to sexual assault and harassment; on the alleged failure to provide properly both for the report and investigation of sexual assault claims, and for the support of cadets who are assaulted; on the alleged lack of sufficient numbers of female faculty and administrators at West Point and on the failure to recruit female cadets; on the allegedly inadequate punishment meted out not only to perpetrators of sexual violence but also to those who engage in misogynistic chants, slurs and comments; and, most broadly, on the assertedly culpable tolerance of a hostile culture toward women at West Point. Adjudicating such a money damages claim would require a civilian court to engage in searching fact-finding about Lieutenant General Hagenbeck and Brigadier General Rapp’s “basic choices about the discipline, supervision, and control” of the cadets that they were responsible for training as future officers. Shearer, 473 U.S. at 58, 105 S.Ct. 3039. In such circumstances, we conclude that Chappell and Stanley squarely foreclose Doe’s Bivens claim.
This conclusion, we note, is consistent with the recent decisions of at least two other circuits. The D.C. Circuit rejected as “patently deficient” a Bivens claim pressed by current and former sailors and Marines who alleged they were the victims of sexual assault or harassment resulting from a military culture attributable to their superiors: “If adjudicating the case would require military leaders to defend their professional management choices— ‘to convince a civilian court of the wisdom of a wide range of military and disciplinary decisions’—then the claim is barred by the ‘incident to service’ test.” Klay, 758 F.3d at 370, 375 (citation omitted) (quoting Shearer, 473 U.S. at 58, 105 S.Ct. 3039). The Fourth Circuit, addressing a similar claim, was equally clear: “Bivens suits are never permitted for constitutional violations arising from military service, no matter how severe the injury or how egregious the rights infringement.” Cioca v. Rumsfeld, 720 F.3d 505, 512 (4th Cir. 2013) (quoting Erwin Chemerinsky, Federal Jurisdiction 621-22 (5th ed. 2007)). This result, the Fourth Circuit said, implies no tolerance for the misconduct alleged in a plaintiffs pleading, but rather reflects “the judicial deference to Congress and the Executive Branch in matters of military oversight required by the Constitution and our fidelity to the Supreme Court’s consistent refusal to create new implied causes of action in this context.” Id. at 518; see also id. at 514 (noting that “the Chappell, Stanley, Feres and Shearer precedents mandate that courts not permit a Bivens action that challenges military decisionmaking”).
Doe argues, relying principally on United States v. Virginia (VMI), 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), that the failure to afford her a Bivens claim against Lieutenant General Hagen-beck and Brigadier General Rapp “contradict[s] VMI,” Doe’s Br. at 15, specifically the Supreme Court’s merits determination therein that the State of Virginia could not preclude women from attending the Virginia Military Institute, a public college that styles itself as providing a military edu *47 cation.[8] VMI, 518 U.S. at 519, 116 S.Ct. 2264. But this argument misses the point. Lieutenant General Hagenbeck and Brigadier General Rapp do not seek dismissal based on the scope of equal protection guarantees—a subject to which VMI could be pertinent. Instead, they invoke binding Supreme Court precedent standing for the proposition that whatever the scope of the particular constitutional rights at issue, the remedy of money damages is unavailable to members of the armed services for violations of those rights where Congress has not acted and the incident-to-service rule is satisfied.
Chappell itself involved an equal protection claim by African American enlisted personnel who alleged that their superior officers “failed to assign them desirable duties, threatened them, gave them low performance evaluations, and imposed penalties of unusual severity,” all on account of their race. 462 U.S. at 297, 103 S.Ct. 2362; see Wallace v. Chappell, 661 F.2d 729, 730 (9th Cir. 1981). Despite the gravity of these allegations, and with no disparagement of the right at stake, the Court, noting that Congress “has established a comprehensive internal system of justice to regulate military life” and “has not provided a damages remedy for claims by military personnel that constitutional rights have been violated by superior officers,” determined that a Bivens remedy was unavailable. Id. at 302-04, 103 S.Ct. 2362. As the Court unanimously recognized, “[jjudges are not given the task of running the Army. The responsibility for setting up channels through which ... grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates.” Id. at 301, 103 S.Ct. 2362 (second alteration in original) (quoting Orloff v. Willoughby, 345 U.S. 83, 93-94, 73 S.Ct. 534, 97 L.Ed. 842 (1953)). VMI is simply not germane to the remedial inquiry mandated by Chappell, Stanley, and other Bivens cases.
Doe next contends, and the dissent agrees, that pursuant to this Court’s decision in Taber v. Maine, 67 F.3d 1029 (2d Cir. 1995), her injuries did not arise incident to military service. This is also incorrect. Taber involved an FTCA claim brought by an off-duty Navy Seabee who was injured in an automobile accident by another off-duty Navy serviceman. Id. at 1032. This Court concluded in Taber that the question whether Feres barred the plaintiffs FTCA claim turned, in the circumstances of that case, on whether a person in Taber’s position would be entitled to workers’ compensation benefits on the theory that when injured he was engaged in activities that “fell within the scope of [his] military employment.” Id. at 1050. Whatever TabeVs significance to this Circuit’s FTCA case law, the Taber panel had no occasion to address either Chappell or Stanley, or the scope of “abstention in the inferring of Bivens actions” more generally.[9] Stanley, 483 U.S. at 683, 107 S.Ct. *48 3054. Moreover, even in the FTGA context, Taber itself noted, citing Supreme Court precedent, that the ineident-to-service rule (regardless of workers’ compensation considerations) is properly invoked when adjudicating the claim of a service member would require “‘commanding officers, to stand prepared to convince a civilian court of the wisdom of a wide range of military and disciplinary decisions.’ ” 67 F.3d at 1049 (quoting Shearer, 473 U.S. at 58, 105 S.Ct. 3039). This is precisely the problem with Doe’s claim here.
Doe attempts to avoid this conclusion by arguing that her damages claim “does not interfere with military discipline or management ... because she only questions school management”—the decisions of Lieutenant General Hagenbeck and Brigadier General Rapp “made in their roles as school administrators—not as military officials.”. Doe’s Br. at 36. The dissent, too, takes this tack.[10] Observing, dismissively, that West. Point serves a military purpose “to some extent,” Dissenting Op. at 59 (emphasis added), the dissent claims..that the “incident to service” rule does not apply because at the time that Doe was allegedly' assaulted, she was “out for an evening walk on a college campus,” id. at 59, and because, more brdadly, Doe while at West Point was not a soldier on the battlefield, but a student attending college. Id. at 58-59. “West Point functions principally as a school,” the dissent urges, and “Doe was primarily a student.” Id. at 59.
With respect, this analysis is both contrary to the case law and unsupported by the factual allegations in Doe’s Amended Complaint.' As Doe has acknowledged, the United States Military Academy at West Point has a single, unitary mission: to “train ‘officer-leaders of character to serve the Army and the Nation.’” Joint App’x 13. Its cadets swear an oath to “at all times obey the legal orders of ... superior officers, and the Uniform Code of Military Justice,” 10 U.S.C. § 4346(d) (emphasis added), and are subject to military discipline pursuant to the Code, id. § 802(a)(2). Cadets are divided into companies, each commanded by an Army officer, “for the purpose of military instruction,” id, § 4349(a), and are ‘.‘trained in the duties of members of the Army,” id. *49 § 4349(e), and even paid as members of the Army, 37 U.S.C. § 203(c). Doe’s contention that this Court might disaggre-gate those aspects of cadets’ lives that concern “education” from those involving them training to be future officers—a contention entirely unsupported by allegations in the Amended Complaint—is thus fanciful, at best, because academic and military pursuits are inextricably intertwined at the United States Military Academy, which exists for “the instruction and preparation for military service” of Army members.[11]10 U.S.C. § 4331(a).
As Chappell recognized, “[t]he inescapable demands of military discipline and obedience to orders cannot be taught on battlefields,” and “conduct in combat inevitably reflects the training that precedes combat.” 462 U.S. at 300, 103 S.Ct. 2362. Doe was not “a soldier on a battlefield” at the time of the events challenged here, as the dissent points out. Dissenting Op. at 59. This observation, however, is beside the point. As a member of the Army, Doe was training at West Point to lead battlefield soldiers. Adjudicating the claim she brings against her superior officers, moreover, which charges them with “creat[ing] á dangerous and sexually hostile environment,” Joint App’x 28, and challenges matters ranging from the alleged “under-representation of women in the school administration” and among the cadet classes, id. at 14, to the alleged tolerance of “sexually aggressive language and conduct by faculty, officials and male cadets,” id. at 28, would require a civilian court to examine a host of military decisions regarding aspects of West Point’s culture, as well as the supervision of West" Point cadets, their training and education, and their discipline by superior officers. Doe’s claim thus “strikes at the core” of the concerns implicated by the incident-to-service rule: that civilian courts are ill-equipped “to second-guess military decisions” regarding “basic choices about thé discipline, supervision, and control” of service members, Shearer, 473 U.S. at 57-58, 105 S.Ct. 3039, that doing so could impair “military discipline and effectiveness” in unintended and unforeseen ways, id. at 59, 105 S.Ct. 3039, and that the “explicit constitutional authorization for Congress ‘[t]o make Rules for the Government and Regulation of the land and naval Forces,’” counsels hesitation as to the wisdom of money damages litigation, where Congress has not authorized it, Stanley, 483 U.S. at 681-82, 107 S.Ct. 3054 (quoting U.S. Const. art. I, § 8, cl. 14).
In sum, West Point is part of the Department of the Army. Its cadets are service members. Lieutenant General Hagen-beck was the commanding officer • of a military base during his time at West Point, and Brigadier General Rapp Commanded the cadets. The future officers who study and train at West Point, like the enlisted men and women they are trained to command, may not invoke Bivens to recover damages for injuries that “arise out of or are in the course of activity incident to service.” Stanley, 483 U.S. at 684, 107 S.Ct. 3054, Doe’s Bivens claim against her superior officers, implicating Army training, supervision, discipline, education, and command, triggers the incident-to-service rule and cannot proceed.
*50 CONCLUSION
We note, as did the D.C. Circuit, that Congress “has been ‘no idle bystander to th[e] debate’ about sexual assault in the military.” Klay, 758 F.3d at 376 (alteration in original) (quoting Lebron v. Rumsfeld, 670 F.3d 540, 551 (4th Cir. 2012)). In reversing the district court’s determination as to the viability of Doe’s Bivens claim, we do not discount the seriousness of her allegations, nor their potential significance to West Point’s administration. As the Supreme Court has made clear, however, it is for Congress to determine whether affording a money damages remedy is appropriate for a claim of the sort that Doe asserts. We therefore join the D.C. Circuit and the Fourth Circuit in concluding that no Bivens remedy is available here. We accordingly need not reach the question whether Lieutenant General Hagenbeck and Brigadier General Rapp are entitled to qualified immunity.
For the foregoing reasons, we REVERSE the order of the district court, and REMAND to the district court with instructions to dismiss Doe’s equal protection claim.

. The factual background presented here is derived from the allegations in Doe’s Amended Complaint, which we accept as true and view in the light most favorable to her in reviewing the district court’s decision on the motion to dismiss. See Starr Int’l Co. v. Fed. Reserve Bank, 742 F.3d 37, 40 (2d Cir. 2014).

. A redacted version of the Complaint was docketed, and an unredacted version was filed under seal, The district court ordered the parties to show cause why the Complaint should remain under seal, and Doe then filed a motion to seal the case. At a hearing, the district court granted the motion in part, and denied it in part. It granted Doe permission to proceed under a pseudonym, and it also ruled that she could continue to redact from public filings the name of "Mr. Smith,” the man she alleged had assaulted her, The district court decided that the names of the individual defendants and the facts and circumstances of the alleged assault, however, should be disclosed. No challenge has, been presented on appeal to this manner of proceeding and we are without the benefit of briefing on the question, We assume, arguendo, that the district court did not abuse its discretion in determining to proceed in this manner and do not address the matter further. But see, e.g., Doe v. Public Citizen, 749 F.3d 246, 275 (4th Cir. 2014) (holding .that the district court's sealing order "violated the public's right of access under the First Amendment and that the [district] court abused its discretion in allowing Company Doe to proceed under a pseudonym”); Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 189 (2d Cir. 2008) (indicating that " ‘[t]he people have a right to know who is using their courts,' ” and describing "the relevant inquiry as a balancing test that weighs the plaintiff’s need for anonymity against countervailing interests in full disclosure” (quoting Doe v. Blue Cross & Blue Shield United, 112 F.3d 869, 872 (7th Cir. 1997))).

. The Court has in recent years prescribed a two-step process for determining whether a Bivens remedy is available in which we consider, first, whether an alternative remedial scheme exists. See Wilkie v. Robbins, 551 U.S. 537, 550, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007). In Stanley, the Court suggested that traditional forms of redress, "designed to halt or prevent" a constitutional violation "rather than [for] the award of money damages,” might sometimes be available in the military context. 483 U.S. at 683, 107 S.Ct. 3054. We nonetheless assume arguendo that there is no alternative remedy here and address ouranal-ysis to the Supreme Court’s admonition that "even in the absence of an alternative,” Wilkie, 551 U.S. at 550, 127 S.Ct. 2588, courts must pay "particular heed” to "special factors counselling hesitation before authorizing a new kind of federal litigation,” id. (quoting *43 Bush v. Lucas, 462 U.S. 367, 378, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983)); see also Stanley, 483 U.S. at 683, 107 S.Ct. 3054 (noting that availability of alternative remedy is "irrelevant” to special factors analysis).

. See Carlson v. Green, 446 U.S. 14, 18-23, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (finding an implied private cause of action for a prisoner’s Eighth Amendment claim); Davis v. Passman, 442 U.S. 228, 230-34, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (finding an implied private cause of action for a congressional employee's employment discrimination claim under the Fifth Amendment).

. See Minneci v. Pollard, 565 U.S. 118, 124-25, 132 S.Ct. 617, 181 L.Ed.2d 606 (2012) (collecting cases); see also, e.g., Malesko, 534 U.S. at 70-73, 122 S.Ct. 515 (no Bivens action for prisoner’s Eighth Amendment-based suit against a private corporation that managed a federal ’ prison); Schweiker v. Chilicky, 487 U.S. 412, 414, 425-27, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988) (no Bivens action for claim by recipients of Social Security disability benefits that benefits had been denied in violation of the Fifth Amendment); Bush, 462 U.S. at 386-90, 103 S.Ct. 2404 (no Bivens action for claim that federal employer demoted federal employee in violation of the First Amendment).

. Given that the Chappell Court squarely held that “military personnel may not maintain a suit to recover damages from a superior officer for alleged constitutional violations” (although the question presented in that' case concerned violations "in the course of military service”), 462 U.S. at 297, 305, 103 S.Ct, 2362, and the Stanley Court only broadened Chappell’s holding, see 483 U.S. at 683, 107 S.Ct. 3054 (explaining that Chappell’s reasoning “extend[s] beyond the situation in which an officer-subordinate relationship exists”), resolution of this case may not require an incident-to-service inquiry at all. Nonetheless, consistent' with the approach of our sister circuits, see Klay v. Panetta, 758 F.3d 369, 374 (D.C. Cir. 2014); Cioca v. Rumsfeld, 720 F.3d 505, 512-14 (4th Cir. 2013), we apply the incident-to-service rule here and reach the same result we would have reached under Chappell alone.

. We have suggested that in some circumstances—for instance, where an issue exists for FTCA purposes as to whether a given automobile accident occurred “within a distinctly military sphere of activity,” see Wake, 89 F.3d at 58—the incident-to-service inquiry may require the analysis of potentially relevant factors, such as the relationship of the activity at issue to membership in the service or the location of the conduct giving rise to the tort claim. Id, No such close analysis is necessary here, however, given the clear relationship between Doe's Bivens claim and management and discipline at West Point. In any event, we note that the balance of the relevant factors we identified in Wake are clearly present here. Doe was a member of the Army; her tuition-free presence at West Point (and access to the facilities therein) was a benefit conferred as a result of that membership; and her constitutional claim arises from her treatment at West Point, where she resided- and was training to become an officer. See id. at 57 (identifying "status as a member of the military,” "the location of the conduct giving rise to the underlying tort claim,” and "whether the service member was taking advantage of a privilege or enjoying a benefit conferred as a result of military service” as among relevant factors).

. The Institute is not affiliated with the U.S. armed forces, nor are its students, by virtue of their enrollment there, members of the United States military. Cf. id. at 520-22, 116 S.Ct. 2264 (describing the Institute as a state military college both financially supported by, and subject to control by, the Virginia General Assembly, and noting that it differs from federal service academies because it prepares students for both military and civilian life).

. As a matter of this Circuit’s FTCA precedent, moreover, it is noteworthy that only some nine months after the amended decision in Taber, this Court in Wake suggested that to the extent the appellant there argued that Taber had created a new “scope of employment” test for determining the applicability of the Feres doctrine, Taber could not be read to alter the reach of Feres, which was then and remains binding precedent. 89 F.3d at 61. This Circuit has not relied on Taber's holding *48 in the intervening twenty-plus years, and at least one other circuit has declined to employ its approach. See Skees v. United States, 107 F.3d 421, 425 n.3 (6th Cir. 1997) (declining to adopt Taber), In such circumstances, Taber is a thin reed, indeed, to support the dissent's position that we may properly entertain a Bivens claim here, despite the broad inquiry that Doe's allegations demand into the discipline, supervision, and control of cadets at West Point, on the theory that Doe, when allegedly assaulted while out after hours, was not " 'engaged in activities that fell within the scope of [her] military employment,’ " Dissenting Op, at 58 (citing Taber, 67 F.3d.at 1050),

. The dissent in addition urges that defendants allegedly violated military regulations in connection with Doe's tenure at West Point and that ‘*[j]udicial review of .., allegations that the individual defendants failed to follow mandatory military ... regulations would not unduly interfere” with the military's proper operation, Dissenting Op, at 60. Suffice it to say that the dissent cites no case law supporting the proposition that the availability of a Bivens damages suit turns on, this contingency, and unsurprisingly, since such an approach would be inconsistent with courts' traditional reluctance "to intrude -upon the authority of the Executive in military and national security affairs' unless 'Congress specifically has provided otherwise.' " Ziglar, 137 S.Ct. at 1861 (quoting Dep’t of Navy v. Egan, 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988)); see also id. at 1858 (citing Chappell and Stanley in suggesting that Congress’s exercise of regulatory authority "in a guarded way” constitutes a special factor'counselling against recognition of a Bivens claim on the ground that it is "less likely that Congress would want the Judiciary to interfere”).

. Moreover, even assuming such disaggregation could be done, it is directly contrary to Stanley's admonition against inquiring whether "particular suits,” examined case by case, "would call into question military discipline and decisionmaking.” 483 U.S. at 682-83, 107 S.Ct. 3054. Such inquiries, the Stanley Court concluded, “raising the prospect of compelled depositions and trial testimony by military officers concerning the details of their military commands,” would themselves "disrupt the military regime.” Id. '